CRIMES AND PUNISHMENTS ** Part II of Part II ** The State of Oklahoma in the past has asserted unquestioned jurisdiction over Indian affairs, due probably to the complexity of laws governing Indians in Oklahoma, acquiescence of federal officials, state court decisions, and the historical belief that Statehood subjected all citizens to the umbrella of Oklahoma state jurisdiction. A 1953 letter from Johnston Murray, Governor of Oklahoma, replying to a suggestion by Orme Lewis, Assistant Secretary of the Interior, that the Governor meet with the Indian tribes in Oklahoma regarding Oklahoma assuming civil and criminal jurisdiction over Indian country in Oklahoma illustrates why the conflict of jurisdiction issue has not surfaced sooner in Oklahoma's history. Governor Murray stated therein: "When Oklahoma became a State, all tribal governments within its boundaries became merged in the State and the tribal codes under which the tribes were governed prior to Statehood were abandoned and all Indian tribes, with respect to criminal offenses and civil causes, came under State jurisdiction. "Therefore, Public Law No. 280 (providing a procedure for the assumption of jurisdiction by the States) will not in any way affect the Indian citizens of this State." Recently, in conformance to the U.S. Supreme Court decision of DeCoteau v. District County Court,420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), on November 7, 1977, the Federal Court for the Western District of Oklahoma found that a homicide which had occurred upon a trust allotment, had occurred upon land defined as "Indian Country," that the State of Oklahoma was without jurisdiction to prosecute the defendant, and that jurisdiction was proper in the federal court. Thus, the federal court overruled a Motion to Dismiss Indictment for Lack of Jurisdiction. Then on January 4, 1978, the Oklahoma Court of Criminal Appeals issued an order in the case of State of Oklahoma v. Littlechief, 573 P.2d 263
(Okl.Cr., App. 1978), holding that the order issued by a federal district judge was binding on the State of Oklahoma since it involved the construction and application of federal statutes, to wit: Act of August 14, 1953, Public Law 83-280, 67 Stat. 488; and Title IV of the Civil Rights Act of 1968, 24 U.S.C. § 1321-1326. The Oklahoma federal judge cited the United States Supreme Court case of Decoteau v. District County Court, supra, where that Court announced: "It is common ground here that Indian conduct occurring on the trust allotments is beyond the state's jurisdiction, being instead the proper concern of tribal or federal authorities." (Emphasis added) The duration of exclusive federal criminal jurisdiction over Indian trust allotments is delineated by federal statute and case law as follows: "Patents in fee to allottees. At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, . . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; . . . Provided further, That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States: . . . ." (The Burke Act, Amendment to the General Allotment Act, Act of May 8, 1906, 34 Stat. 182, 25 U.S.C. § 349). State jurisdiction over crimes committed by Indians would lie when an Indian trust allotment ceases to be land within Indian Country by the extinguishment of Indian title to such land through treaty or government patent to individuals, or the conveyance of such land to a non-Indian. State v. Moss, Wym, 471 P.2d 333 (1970); Tubby v. State, Miss., 327 So.2d 272
(1976). It is clear, then, that presently, the State of Oklahoma possesses no jurisdiction to prosecute crimes and offenses defined by the Major Crimes Act committed by Indian against Indian upon trust allotment lands within the geographical boundaries of the State of Oklahoma so defined as "Indian Country." This is not to say, however, that state officers do not possess the power to arrest Indian offenders for the commission of federal crimes defined under the Major Crimes Act. This general rule of law was enunciated well by the United States Court of Appeals for the Fifth Circuit wherein it stated: "It was at an early date questioned whether the Congress could constitutionally impose upon state officers the power and duty to enforce federal criminal law . . .; but that issue has now been settled in the affirmative upon the basis of the Supremacy Clause, and of the 'fact that the States of the Union constitute a nation.' Testa v. Katt, 330 U.S. 386
(1946). Therefore, authority exists for local police officers, acting under color of state law alone, to contain a dangerous criminal who has committed a crime upon Indian Country but is apprehended elsewhere and to seek prosecution of the offender by the U.S. Attorney in the federal courts. Regarding crimes not defined by the Major Crimes Act, or generally, misdemeanor crimes, the conflict of jurisdiction lies between the tribal authorities and the federal government. Federal court decisions have affirmed the power of the Indian people to make their own substantive law in internal matters. Roff v. Burney, 168 U.S. 218 (1897); Williams v. Lee, 358 U.S. 217
(1958), and to enforce that law in their own forums. The recent case of Santa Clara Pueblo v. Martinez, No. 76-682, ___ U.S. ___, L.Ed.2d ___, 98 S.Ct. 1670
(1978), reaffirmed the proposition that Indian tribes are distinct, independent political communities retaining their original natural rights in matters of local self-government. They are a "separate people with power to regulate their internal and social relations." Rights of prosecution of misdemeanor crimes by the tribal courts was acknowledged in the Indian Civil Rights Act, 25 U.S.C. § 1302
(1968), where the following restrictions were imposed on the tribal governments by the Congress: ". . . In no event shall the tribe impose for conviction of any one offense any penalty of punishment greater than imprisonment for a term of six months or a fine of $500.00 or both." Problems arise, however, where Indian tribes have failed to adopt constitutions or where constitutions and charters have been adopted, when they fail to provide for a tribal judicial system and tribal police. This appears to be characteristic of many Oklahoma tribes with tribal constitutions who are organized under the Oklahoma Indian Welfare Act, Act of June 26, 1936, 49 Stat. 1967,25 U.S.C. § 501 et seq. See 503, 504. Therefore, in instances where tribal authorities have failed to establish a tribal court system or tribal criminal code and until such time as they do so, the laws of the State of Oklahoma governing criminal conduct not cognizable under the Major Crimes Act may be applied to make those criminal acts, committed upon Indian Country which is under the exclusive jurisdiction of the United States, penal under the federal law and ordinarily to be prosecuted in the federal courts. People ex rel. Ray v. Martin, 181 Misc. 925, 47 N.Y.S.2d 883 (1944), aff'd.,326 U.S. 496, 90 L.Ed. 261, 66 S.Ct. 307. Authority for these actions is provided by the Assimilative Crimes Act,18 U.S.C. § 13. (In that connection see also 18 U.S.C. §; 7). The Assimilative Crimes Act reads as follows: "Laws of States Adopted for Areas Within Federal Jurisdiction. Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in Section 7 of this Title any lands reserved . . . for the use of the United States, and under the exclusive or concurrent jurisdiction thereof . . . . is guilty of any act or omission which although not made punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the law thereof enforced at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment. 18 U.S.C. § 13 (June 25, 1948)." The Assimilative Crimes Act has been construed to make violation of a State law a federal offense when the act or omission in question (1) occurs on land reserved to the federal government, (2) is not otherwise an offense against the United States, and (3) is not made punishable by any act of Congress over which federal courts otherwise would have jurisdiction. United States v. O'Byrne, Vir.,423 F. Supp. 588 (D.C. 1973). Further authority for extension of this Act to crimes committed on Indian Country is found in the case of United States v. Burland, Mont., 441 F.2d 1199 (9th Cir. 1971). There, the Court of Appeals held that the District Court had jurisdiction to try a case involving the offense of passing a forged check, a crime within the State of Montana but not under federal law, when the offense was committed on the Fort Peck Indian Reservation by an Indian against a non-Indian. An Indian Reservation has, too, been defined as "Indian Country" under 18 U.S.C. § 1151. Therefore, it is clear that jurisdiction over misdemeanor crime not cognizable under the Major Crimes Act is possessed concurrently by the federal and tribal courts. And in the event that no judicial machinery exists under tribal constitution for the prosecution of misdemeanor crimes committed upon Indian Country by an Indian against another Indian, the federal government retains jurisdiction of the matter under the Assimilative Crimes Act. It is clear, then, that the State of Oklahoma is without jurisdiction to prosecute crimes committed upon Indian trust allotment lands defined as "Indian Country" when such crimes are committed by an Indian against another Indian. Your second question inquires as to whether federal commissioning of state and local police as Special Officers can be accomplished under Oklahoma law to allow these officers to enter upon Indian country, under the cloak of federal authority, and assist in the apprehension and containment of Indian criminal offenders. By delegation from the Secretary of the Interior, the Commissioner of Indian Affairs promulgated the Indian Affairs Manual. Section 2.15.1 of Part 68 of the Indian Affairs Manual, provides the authority for issuance of these commissions and reads in relevant part as follows: "2.15 Issuance of Deputy Special Officer Commissions. .1 Policy and Purpose. It shall be the policy of the Bureau of Indian Affairs to issue Deputy Special Officer Commissions to persons who serve without compensation for the purpose of obtaining the cooperation and assistance of State, County and local law enforcement officers who may be in a position to render assistance in the maintenance of law and order on Indian reservations and in the suppression of traffic and intoxicants and narcotics among Indians . . ." Regarding the legality of this practice, it must first be determined if the Commission in question constitutes a "an office" under Oklahoma law. Concerning this issue, the Oklahoma State Constitution at Article 2, Section 12 contains a prohibition against dual office holding. Section 12 reads as follows: "No member of Congress from this State, or person holding any office of trust or profit under the laws of any other state, or of the United States, shall hold any office of trust or profit under the laws of this state." It is clear then that a "cross-deputization" between a federal and a state officer allowing each to exercise the full rights and duties of the other, would be prohibited by this provision. However, the situation at bar does not involve cross-deputization. Based on the following reasoning, the Regional Solicitor of the United States Department of the Interior wrote an Opinion of which we are in receipt holding that the issuance of a Deputy Special Officer Commission does not confer an "office" upon the holder. The Solicitor reasoned that the recipient of such a commission does not by legal definition become possessed of a second office under the federal government because he is not carried on the roles of the Bureau of Indian Affairs as an employee, he receives no salary from the Bureau, nor is he accountable to or under the supervision of any federal officer or department. We further observe that neither does he exercise the full authority of a federal marshall but only that portion of the sovereign power which he is called upon to exercise in assisting federal officers in the apprehension of miscreants. Therefore, the commission is a type of temporary and limited deputization issued as a stop-gap measure for the purpose of practically dealing with the existent emergency situation. Such commission does not purport to make deputy federal marshals of state law enforcement officials. For the aforementioned reasons, we are in agreement with the Solicitor's Opinion. Cooperation among law enforcement agencies at all levels of government has existed since statehood in Oklahoma. Further, this office has voiced approval for the idea of federal-state law enforcement cooperation in Opinion No. 77-180 dated June 30, 1977, regarding cooperation required among state and local law enforcement agencies. That opinion noted that: "The fact that the assistance sought may emanate from the state authority does not change the result that, in the state, cooperation between law enforcement agencies has been fostered. In that regard, the concept of permissible local law enforcement cooperation with federal agencies would, by analogy, be sanctioned." Since the recent Littlechief decision, however, state law enforcement officials have been reluctant to answer calls for assistance in areas where law enforcement jurisdiction cannot be clearly or immediately determined for fear of exceeding that jurisdiction. The problem is crucial in areas of the state which are "checkerboarded" with land defined as "Indian Country." Therefore, issuance of Deputy Special Officer Commissions from the federal government to state officers appears to be the most practical method of vesting them with limited authority to go upon Indian Country to preserve and maintain law and order without fear of the consequences of an ultra vires exercise of authority. Finding, then, no prohibition under Oklahoma law against the issuance of these commissions, we hold that they may be accepted by state officers for the purpose of cooperation with federal officials in the maintenance of law and order in Indian Country. It is, therefore, the opinion of the Attorney General that your questions be answered as follows: Presently, the State of Oklahoma possesses no jurisdiction to prosecute crimes and offenses defined by the Major Crimes Act, committed by Indian against Indian, upon trust allotment lands within the geographical boundaries of the State of Oklahoma so defined as "Indian Country." This is not to say, however, that state officers acting solely under color of state law do not possess the power to arrest Indian offenders for the commission of federal crimes defined under the Major Crimes Act when such offenders are found within the jurisdiction of the officer and not on "Indian Country." State officers may seek prosecution of an Indian offender by the U.S. Attorney; such prosecution must exclusively be had in the Federal courts. However, state jurisdiction over crimes committed by Indians would lie when an Indian trust allotment ceases to be land within "Indian Country" by the extinguishment of Indian title to such land through treaty or government patent to individuals, or the conveyance of such land to a non-Indian. Regarding the crimes not defined by the Major Crimes Act, or generally, misdemeanor crimes, it is clear that jurisdiction over these crimes is concurrently possessed by federal and Indian tribal courts. In the event that no judicial machinery exists under tribal constitution for the prosecution of misdemeanor crimes committed upon Indian Country by an Indian against another Indian, the federal government retains jurisdiction under the Assimilative Crimes Act. It is clear, then, that the State of Oklahoma is without jurisdiction to prosecute crimes committed upon Indian trust allotment lands defined as "Indian Country" when such crimes are committed by an Indian against another Indian. No prohibitions exist under Oklahoma law to sanction the acceptance by state and local officers of Deputy Special Officer Commissions from the United States Department of the Interior to allow their entrance upon Indian Country to assist federal law enforcement officials in the apprehension of criminals and the maintenance of law and order therein. (CATHERINE GATCHELL NAIFEH) (ksg)